Richard J. McCord, Esq. (RJM 3290)
Robert D. Nosek, Esq. (RDN 7676)
CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for Sterling National Bank as
Successor in Interest to Provident Bank
90 Merrick Avenue
East Meadow, NY 11554
Phone: (516) 296-7000

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                              Chapter 11

BROADWAY EQUITY HOLDINGS, LLC,          Case No. 17-22242-rdd

                                    Debtor.
-------------------------------------------------------X

## MOTION BY STERLING NATIONAL BANK, AS SUCCESSOR IN INTEREST TO PROVIDENT BANK, TO DISMISS THE DEBTOR'S CASE PURSUANT TO 11 U.S.C. § 1112(b); OR, IN THE ALTERNATIVE, VACATE THE AUTOMATIC STAY WITH RESPECT TO REAL PROPERTY KNOWN AS 152 BROADWAY, HAVERSTRAW, NEW YORK 10927 PURSUANT TO 11 U.S.C. § 362(d) AND BANKRUPTCY RULES 2002, 4001 AND 9014

Upon the motion (the "**Motion**") of secured creditor Sterling National Bank ("**Sterling**"), as successor in interest to Provident Bank ("**Provident**"), by its attorneys, Certilman Balin Adler & Hyman, LLP, Movant hereby moves this Court pursuant to 11 U.S.C. §§ 105(a), 362(d) and 1112(b) and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") for an Order (i) dismissing the Chapter 11 case of Broadway Equity Holdings, LLC (the "**Debtor**"); (ii) or, alternatively, vacating the automatic stay with respect to the real property known as 152 Broadway, Haverstraw, New York 10927 (the "**Real Property**") and the Debtor's interest in that property, if any, as collateral for a subordinated third mortgage against that property, so that Sterling may commence a first lien foreclosure action against the Real Property and name the Debtor in such action as a holder of a subordinate lien interest as

6428190.4

required under New York State foreclosure law, and (iii) for such, other further and related relief as the Court deems just, proper and equitable.  In support of the Motion, Sterling respectfully represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  Venue in this district is proper pursuant to 28 U.S.C. § 1409.  The principal statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 362(d), and 1112(b).

## BACKGROUND

2.      The Debtor filed this Chapter 11 case on February 17, 2017 ("Petition Date").

3.      The Debtor is managing its affairs as a debtor-in-possession pursuant to 11 U.S.C. § 1107.

4.      No trustee, examiner or official committee of unsecured creditors has been appointed in this case to date.

5.      The Debtor is a holding company with its primary asset being a $6 million promissory note, executed on September 4, 2014 (the "**Broadway Note**"), with Debtor as payee, allegedly given with respect to certain loan(s) made to 152 Broadway Haverstraw NY LLC ("**152 Broadway**") and Blue Beverage Group, Inc. ("**Blue Beverage,**" and collectively with 152 Broadway, the "**Broadway Equity Borrowers**").  The Broadway Note is secured by a mortgage (the "**Third Lien Mortgage**") against the Real Property that is owned by 152 Broadway. According to the Debtor, $5,300,000 was advanced to 152 Broadway and/or Blue Beverage as of the signing of the Broadway Note.

2

6.      The Debtor openly declares that its intention in commencing this case is so that it can remove its stalled state court foreclosure action against 152 Broadway and Blue Beverage and other parties to this Court, which it believes can promptly adjudicate its claims in that action. *See* Affidavit of Judy Minster Pursuant to Local Rule 1007-2 [ECF No. 1],[1] a copy of which is annexed hereto as **Exhibit L**.

7.      To date, the Debtor has not filed a plan and disclosure statement in its case, notwithstanding the case was filed almost eight months ago.

8.      The Debtor's only real asset is the Broadway Note and Third Lien Mortgage notwithstanding the Debtor also listing a small amount in a bank account, an interest in an entity that owns an insurance policy, and an interest in an entity, 165 Grafton LLC (the "**Property Holding Company**") that owns a parcel of real property in Brooklyn, New York (the "**Brooklyn Property**"). *See* Debtor's Schedule A/B [ECF No. 1][2]; *see also* Transcript of Hearing on June 6, 2017 [ECF No. 26][3] at 87:4-10.  The interest in the Property Holding Company is encumbered by a $100,000 secured claim, leaving the Debtor's interest in that asset at an alleged $50,000. There is no information in the Debtor's petition whether the Brooklyn Property itself is otherwise encumbered, which, if so, could further reduce the Debtor's indirect ownership value or entirely wipe it out.[4]

---

[1]  Citations to "ECF No. __" or to "AP ECF No. __" refer to the location that the referenced document can be found on the Court's electronic case filing dockets for this case and related adversary proceeding, 17-08215-rdd, respectively.

[2]  Copies of the Debtor's Schedules A/B, D, and E/F, as well as the page from the Debtor's Statement of Financial Affairs containing question 28 are annexed hereto as **Exhibit M**.

[3]  The June 6, 2017 transcript will hereinafter be referred to as "**Hr'g Tr.** __:__," with a copy of the relevant pages annexed hereto as **Exhibit N**).

[4]  A search of public records from the City of New York through ACRIS indicates that the Brooklyn Property is subject to two mortgages in the aggregate principal amount of $520,000.  A copy of a printout from ACRIS is annexed hereto as **Exhibit O**.

6428190.4

9.     The Debtor has only 11 creditors in total, with ten unsecured creditors, and one secured creditor holding a $100,000 claim secured by the Debtor's interest in the Property Holding Company. *See* Ex. M, Debtor's Schedules D & E/F. The unsecured creditors are comprised of two creditors that may be insiders or affiliates of the Debtor holding combined claims of $2,936,250, five other general unsecured creditors with claims totaling $33,135, and three priority unsecured tax claims totaling $4,500. *See* Debtor's Schedule E/F. However, it appears that the C Fink Family Trust, holding a claim of $436,250, may have some relation to a ten percent equity holder of the Debtor. *Compare* Debtor's Schedule E/F with Debtor's Statement of Financial Affairs, question 28 (listing Fink Family IRR Trust as a 10% equity owner of the Debtor, with an address care of 1230 44th Street, Unit 3, Brooklyn, NY 11219). *See* Ex. M. Moreover, allegations have been made in the case that the B and M Steimentz Foundation may also be related. *See* Arbitration Motion [AP ECF No. 6] ¶ 6 (asserting that B and M Stein Mentz are related to the Debtor's accountant).

Encumbrances Against the Real Property

10.     On or about August 18, 2008, 152 Broadway purchased the Real Property and, in doing so, borrowed money and executed a mortgage in favor of Jay Kimmel, as nominee for Taron Partners LLC ("**Kimmel**") in the amount of Five Million Dollars ($5,000,000.00) (the "**Original Loan**"), which was recorded in the Rockland County Clerk's Office on September 17, 2008 as Instrument Number 2008-00042231 (the "**First Lien Mortgage**"), a copy of which is annexed hereto as **Exhibit A**.

11.     Upon information and belief, in or about September 2009, 152 Broadway sought to refinance the Original Loan with Provident Bank (the "**First Lien Loan**"), and Empire State Certified Development Corporation (the "**CDC**") and the U.S. Small Business Administration

4

(the "**SBA**"). In furtherance of that transaction, on or about September 17, 2009, several agreements were entered into as follows:

(i)     Amended and Restated Promissory Note, dated September 17, 2009, in the principal amount of $3,534,000, with 152 Broadway as the borrower and Provident as the lender (the "**First Lien Note**"), a true and correct copy of which is annexed hereto as **Exhibit B**;

(ii)    Mortgage Modification and Extension Agreement, dated September 17, 2009, by and between Provident, as mortgagee, and 152 Broadway, as mortgagor, in the amount of $3,534,000, which, among other things, modified the First Lien Mortgage and continues to secure the First Lien Note with the Real Property, and was recorded in the Rockland County Clerk's Office on October 7, 2009 as Instrument Number 2009-00036488 (the "**First Lien Mortgage Modification**"), a true and correct copy of which is annexed hereto as **Exhibit C**);

(iii)   Assignment of Leases and Rents, dated September 17, 2009, with 152 Broadway, as assignor, and Provident, as assignee, which was recorded in the Rockland County Clerk's Office on October 7, 2009 in Instrument Number 2009-00036490, a true and correct copy of which is annexed hereto as **Exhibit D**);

(iv)    Mortgage and Security Agreement, dated September 17, 2009, by and between 152 Broadway, as mortgagor, and CDC, as mortgagee, in the principal amount of $2,493,000.00, which was recorded in the Rockland County Clerk's Office on September 29, 2009 as Instrument Number 2009-

6428190.4

00035291 (the "**Second Lien Mortgage**"). The Second Lien Mortgage was simultaneously assigned by CDC to the SBA by Assignment of Mortgage, dated September 17, 2009, which was recorded in the Rockland County Clerk's Office on September 29, 2009 as Instrument Number 2009-00035292 (the "**Second Lien Mortgage Assignment**"). The Second Lien Mortgage secures a promissory note from 152 Broadway in the principal amount of $2,493,000 (the "**Second Lien Note**"), which is, upon information and belief, currently owned and/or held by the SBA. Copies of the Second Lien Mortgage and Second Lien Mortgage Assignment are annexed hereto as **Exhibit E**.

(v)     The First Lien Mortgage was assigned by Kimmel, as assignor, to Provident, as assignee, under an Assignment of Mortgage, dated September 17, 2009, which was recorded in the Rockland County Clerk's Office on October 7, 2009, as Instrument Number 2009-00036469, a copy of which is annexed hereto as **Exhibit F**.

12.     On September 4, 2014, the Broadway Equity Borrowers jointly and severally executed and delivered to the Debtor, a promissory note for the purposes of evidencing a loan from the Debtor to the Broadway Equity Borrowers in the sum of $6,000,000.00 (the "Operations Note"). As security for the repayment of the Operations Note, 152 Broadway executed a mortgage covering the Real Property, with 152 Broadway, as mortgagor, and the Debtor, as mortgagee (the "**Third Lien Mortgage**," a copy of which is annexed hereto as **Exhibit G**.

6

6428190.4

13.    There is no dispute that the Third Lien Mortgage is subordinate to the First Lien Mortgage and the Second Lien Mortgage. *See* Debtor's Amended Complaint, dated June 15, 2017 [AP ECF No. 24] ¶ 31 (a copy of which is annexed hereto as **Exhibit H**); *see also* Declaration of Judy Minster (the "**Minster Declaration**") [AP ECF No. 15] ¶ 9, a copy of which is annexed hereto as **Exhibit I**.

14.    152 Broadway is in default under the terms of the First Lien Note, upon which there is currently due and owing principal in the sum of $3,027,857.61, together with interest in the sum of $8,129.32, and late fees in the sum of $105,727.00. *See* Worksheet for Relief from Stay – Real Estate and Cooperative Apartment, Certification for Business Records (the "**Worksheet**"), a copy of which is annexed hereto as **Exhibit J**. The total amount due and owing on the subject loan is $3,199,493.30 as of the Petition Date, (the "**First Lien Debt**"). *Id.*

15.    Sterling is in physical possession of the original First Lien Note and the First Lien Mortgage. *Id.*, Worksheet and Declaration of Stuart Kratter.

16.    Upon information and belief, 152 Broadway is also in default of its obligations to the SBA under the Second Lien Note and Second Lien Mortgage, with the SBA being owed on the Second Lien Note an outstanding principal balance in the amount of $1,820,981.12, plus interest in the sum of $44,346.15 as of September 30, 2017 (the "**Second Lien Debt**").

17.    Pursuant to an appraisal dated June 15, 2017 (the "**Appraisal**"), the Real Property is valued at $6,600,000 as of June 5, 2017 if such property is to be sold within a 12-month disposition period. *See* Appraisal 3, a copy of which is annexed hereto as **Exhibit K**.[5]  For

---

[5] The Appraisal also provides an "As-Is Condition" value under "normal market conditions" of $8,270,000, but notes that "[g]iven the excessive burden of the subordinate mortgage and judgments, the apparent plant closure and the subsequent bankruptcy filing could force a disposition of the property."

6428190.4

purposes of this motion,[6] Sterling submits that the lower value is an appropriate measure of value, particularly given that the Debtor is itself seeking to compel a foreclosure sale through its Removed Action (defined below). *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537, 114 S. Ct. 1757, 1761, 128 L. Ed. 2d 556 (1994) ("[M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value.").

18.    The outstanding principal on the First Lien Debt and Second Lien Debt totals $4,848,838.73, plus interest, fees, and costs (collectively, the "**Indebtedness**"). In view of the total Indebtedness due to Sterling and the SBA, there appears to be equity in the Real Property after accounting for the total amounts due on the First Lien Debt and Second Lien Debt; however the issue as to whether such equity should be a part of the Debtor's estate is currently subject to litigation between the Debtor and 152 Broadway and related parties that was recently removed and referred to this Court.

19.    On or about June 9, 2015, the Debtor commenced a foreclosure action against, among other parties, the Broadway Equity Borrowers, in the Supreme Court of the State of New York, County of Rockland (the "**State Court**"), bearing index number 032478/2015, and styled *Broadway Equity Holdings LLC v. 152 Broadway Haverstraw NY LLC, Blue Beverage Group, Inc., Joseph Goldberger, Toby Weinberger, MFT Holdings LLC, Jeno Guttman, Ryvkie Goldberger, Land Track Title Agency, LC, Village of Haverstraw Receiver of Taxes, Commissioner of Finance of the County of Rockland, New York State Department of Taxation and Finance, "John Doe No. 1" through "John Doe No. 10"* (the "**State Foreclosure Action**").[7]

---

[6] *See* 11 U.S.C. § 506(a).
[7] Upon information and belief, during the State Foreclosure Action defendant Jeno Guttman was substituted by the Estate of Jeno Guttman. Hereinafter the "**Borrower Group**" means, collectively, the Broadway Equity Borrowers, J. Goldberger, Toby Weinberger, MFT Holdings LLC, the Estate of Jeno Guttman, and R. Goldberger.

8

The State Foreclosure Action sought to foreclose against the Real Property and extinguish junior liens because of the Borrower Group's non-payment of the Broadway Note.

20.     The crux of that litigation concerns the Debtor's allegations that Toby Weinberger, MFT Holdings LLC, the Estate of Jeno Guttman, and R. Goldberger filed sham confessions of judgment in January 2015 totaling approximately $13.850 million (collectively, the "Judgment Liens"), with J. Goldberger allegedly executing and filing, on behalf of the Broadway Equity Borrowers, a supposedly fraudulent "corrective" mortgage meant to add onerous terms to the Third Lien Mortgage that the Debtor allegedly did not, and never would have, agreed to, in order to place that mortgage behind the Judgment Liens in priority. *See Ex. H, Amended Complaint ¶¶ 35-43.*

21.     On February 23, 2017, the State Foreclosure Action was removed and referred to this Court (the "Removed Foreclosure Action"). *See ECF No. 4.*[8] By order entered June 6, 2017, this Court, among other things, denied remand of the Removed Foreclosure Action, and permitted the Debtor to file an amended complaint to include additional claims against certain of the defendants, including fraud claims. *See AP ECF No. 21.*

22.     The Debtor acknowledges that its lien claim against the Real Property is subordinate to the First Lien Mortgage and the Second Lien Mortgage. *See Ex. H, Amended Complaint ¶ 31; Ex. I, Minister Dec. ¶ 9.*

23.     Moreover, it is indisputable that Sterling has not received any payment on the First Lien Loan from 152 Broadway or any other person since February 28, 2017. *See Ex. J,*

---

[8] By So Ordered Stipulation entered by the Court on June 8, 2017, Defendant Land Track Title Agency, LLC was dismissed as a defendant from the Removed Action with prejudice. *See AP ECF No. 22.*

6428190.4

Worksheet ¶ 11. Accordingly, neither the Debtor nor 152 Broadway could offer a defense to a foreclosure action commenced by Sterling.

24.     As discussed below, the Debtor's case should be dismissed.

25.     In the alternative, relief from the automatic stay is warranted pursuant to Section 362(d)(1) for cause, to allow Sterling to exercise any and all of its rights under the First Lien Mortgage and under the laws of the State of New York, including any action necessary to foreclose its interest in the Real Property.

**Debtor's Case Should Be Dismissed Under § 1112(b) of the Bankruptcy Code**

26.     Bankruptcy Code 1112 provides that a Court can dismiss a chapter 11 case "for cause." 11 U.S.C. § 1112(b). Such dismissal must be in the best interests of both the debtor seeking dismissal and its creditors. *Id.* Although Bankruptcy Code § 1112(b) contains sixteen examples of events that constitute "cause," that list is not exhaustive, and "courts are free to consider other factors." *See BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

**Debtor's Inability to Confirm a Plan is "Cause" to Dismiss Its Case**

27.     Here, the Debtor does not appear to be anywhere near to offering a plan notwithstanding being more than eight months into the case with a lapse of its exclusive period to file a plan, has no cash flow, and has no other assets available to support a plan, except for success on its litigation against the Borrower Group. *See generally* ECF Docket, and the Debtor's monthly operating reports; *see also* Hr'g Tr. 87:8-10. Its sole funding source is currently subject to litigation. *See generally* Ex. H, Amended Complaint. The foregoing has been found by courts in this District to constitute "cause" under § 1112(b)(1). *See, e.g., In re FRGR Managing Member LLC*, 419 B.R. 576, 584 (finding cause to convert or dismiss chapter

10

6428190.4

11 case in light of debtor's inability to "confirm a plan of reorganization in a timely fashion

based solely on its litigation claims" regardless of merits of those claims); *In re Photo Promotion

Assocs., Inc.*, 47 B.R. 454, 459 (S.D.N.Y. 1985) (finding cause to convert or dismiss based on

lack of capital and no current prospect of proposing a plan). Thus, because the Debtor does not

exhibit any ability to confirm a plan in a timely fashion, "cause" exists to dismiss the Debtor's

case.

28.    Separately, a bad faith filing has also been found to be "cause" for dismissal of a

case under § 1112(b) of the Bankruptcy Code. *See C-TC 9th Ave.*, 113 F.3d 1304, 1311-12 (2d

Cir. 1997).

29.    Those factors include:

(i)    the debtor has only one asset;
(ii)   the debtor has few unsecured creditors, whose claims are small in
       relation to those of the secured creditors;
(iii)  the debtor's one asset is the subject of a foreclosure action as a result
       of arrearages or default on the debt;
(iv)   the debtor's financial condition is, in essence a two party dispute
       between the debtor and secured creditors which can be resolved in the
       pending state foreclosure action;
(v)    the timing of the debtor's filing evidences an intent to delay or frustrate
       the legitimate efforts of the debtor's secured creditors to enforce their
       rights;
(vi)   the debtor has little or no cash flow;
(vii)  the debtor can't meet current expenses including the payment of
       personal property and real estate taxes; and
(viii) the debtor has no employees.

30.    The first *C-TC 9th Ave.* factor is satisfied because the Broadway Note and Third

Lien Mortgage are, in effect, the Debtor's only asset from which to fund payments to its creditors

in the event it recovers on it.

31.    In examining the third *C-TC 9th Ave.* factor, there is no dispute that the Third

Lien Mortgage is at the center of the Removed Foreclosure Action. Although that action was

11

6428190.4

commenced by the Debtor because the Broadway Equity Borrowers were not paying on the Broadway Note, the defendants in that action have now counter-claimed against the Debtor and related parties challenging the validity of the Broadway Note and the Third Lien Mortgage with allegations of forgery.

32.    The Debtor indicates its reasons for filing arise from the State Court's delay in issuing a ruling on pending motions in the State Court, as well as the Borrower Group's failure to make payments on the Third Lien Mortgage.  Thus, this case is effectively a two-party dispute between the Debtor and the Borrower Group, which appears aligned in interest against the Debtor, thereby satisfying the fourth *C-TC 9th Ave.* factor.

33.    Sterling recognizes that the Court has already denied a motion to remand the State Foreclosure Action, but (i) that analysis examined mostly factors not applicable to whether to dismiss the case; and (ii) that denial does not diminish the fact that the dispute *could* be resolved in the state court which is the focus of the factor here.  Sterling seeks to commence its own foreclosure action against 152 Broadway and the Real Property, and needs to name the Debtor as a necessary party in that action.  *See* N.Y.R.P.A.P.L § 1311.

34.    The Debtor acknowledges that the First Lien Loan and Second Lien Loan are superior to its position.  *See* Ex. H, Amended Complaint ¶ 31; Ex. I, Minster Dec. ¶ 9.  Such admission means that the Debtor has no defense to such action, and, thus, foreclosure is appropriate as against it.  Upon Sterling being successful in its foreclosure action, to the extent the Removed Foreclosure Action has still not been resolved, the Debtor's current lien priority and damage claims against the Borrower Group is essentially a form of surplus money litigation between those junior interest holders.  Alternatively, it could commence a surplus money proceeding in state court and seek a deficiency judgment under New York R.P.A.P.L. §§ 1361 *et*

12

6428190.4

*seq.* if appropriate. Thus, upon the modification of the automatic stay and commencement of a foreclosure action by Sterling, the Debtor's rights continue to be protected.

35.    Moreover, there is no real prejudice against the Debtor if it was named in a new state court action, because such action would not involve a dispute between itself and Sterling given that the Debtor already acknowledges that it is in a junior position to both the First Lien Mortgage and the Second Lien Mortgage. Accordingly, just because Sterling would be naming the Debtor in a foreclosure action because of its subordinate lien position, it does not change the fact that this case is really a two-party dispute.

36.    There is no dispute that the Debtor has little to no cash flow, that it has no employees, and that it cannot meet current expenses, such as the ongoing incurrence of legal fees arising from the Removed Foreclosure Action. As a result, the sixth, seventh, and eighth factors under *C-TC* are satisfied.

37.    As to the fifth *C-TC* factor addressing the timing of the bankruptcy filing, the filing here had the effect of delaying and/or frustrating the rights of Sterling to foreclosure against the Real Property. Sterling has not been paid since February 28, 2017, with 152 Broadway in arrears on the First Lien Loan of approximately $509,000 as of October 12, 2017. *See* Ex. J, Worksheet ¶ 22.

38.    The second *C-TC 9th Ave.* factor examines whether a debtor has few unsecured creditors, whose claims are small in relation to its secured creditors. Although it presently appears that the second *C-TC 9th Ave.* factor may weigh against a finding of bad faith because of the number of creditors and amounts of their respective claims, there is insufficient information in the record as to whether either or both of the two largest unsecured creditors, i.e., B and M Steimentz Foundation and C Fink Family Trust, are related to the Debtor's principals. However,

6428190.4

if they are related entities, the weight would shift so that this factor would instead weigh in favor of finding bad faith on the part of the Debtor.

39.     Thus, based on the foregoing, cause exists to dismiss or convert this case.

40.     "Courts have looked to multiple factors to determine which action is in the best interest of the creditors and the estate." *FRGR Managing Member*, 419 B.R. 576, 580 (Bankr. S.D.N.Y. 2009).

41.     *Collier on Bankruptcy* identifies ten such factors:

(1)     Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

(2)     Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

(3)     Whether the debtor would simply file a further case upon dismissal.

(4)     The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.

(5)     In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.

(6)     Whether any remaining issues would be better resolved outside the bankruptcy forum.

(7)     Whether the estate consists of a "single asset."

(8)     Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

(9)     Whether a plan has been confirmed and whether any property remains in the estate to be administered.

(10)    Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns."

*Id.* at 580–81 (quoting 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6] (16th ed. 2009)).

42.     Dismissal is in the best interests of creditors based on factors (1), (2), (5), (6), and (7).

43.     There is no evidence in this case that the Debtor made any preferential payments, or that any inequality of distribution could result if the case was dismissed.  The Debtor is a non-

14

6428190.4

operating company with no cash flow. It also has minimal creditors, most of which are general unsecured creditors. Factor one weighs in favor of dismissal.

44.     As discussed previously, the Debtor has its rights to seek payment of its claim from surplus monies upon a first lien foreclosure. See N.Y. R.P.A.P.L. §§ 1361 *et seq.* Those rights would survive the dismissal of the Debtor's case. Thus, the second factor weighs in favor of dismissal.

45.     The Debtor's sole asset is the Broadway Note and the Third Lien Mortgage. The value of that asset is dependent on the outcome of its litigation with the Borrower Group. Whether that litigation is decided after dismissal or after conversion, the Debtor's economic enterprise remains unchanged, as it is a holding company with no operations and no employees. Accordingly, as they are inter-related in this case, factors five and seven both weigh in favor of dismissal.

46.     Factor six also weighs in favor of dismissal because any remaining issues do not require the bankruptcy forum to resolve same. On the other hand, conversion of the Debtor's case would add additional administrative costs that would be payable ahead of any payments to the Debtor's unsecured creditors.

47.     Based on the foregoing, it is in the best interest of the Debtor's creditors to dismiss the case rather than convert it.

48.     Accordingly, Sterling requests that the Debtor's case be dismissed under § 1112(b)(2) for cause.

6428190.4

## Relief From the Automatic Stay Should be Granted

49.    In the alternative, relief from the automatic stay should be granted to permit
Sterling to commence a foreclosure action against the Real Property and name the Debtor as a
subordinate lienholder.

50.    Under Section 362(d) of the Bankruptcy Code, relief from the automatic stay
instituted upon the filing of a bankruptcy petition may be granted "for cause." 11 U.S.C. §
362(d)(1). That section provides in pertinent part as follows:    On request of a party in interest
and after notice and a hearing, "the court shall grant relief from the stay . . . such as by
terminating, annulling, modifying, or conditioning such stay." 11 U.S.C. § 362(d). Under
paragraph (1) of subsection (d), relief may be granted "for cause, including the lack of adequate
protection of an interest in property of such party in interest." Separately, under paragraph (2)
relief "with respect to a stay of an act against property" is warranted if "(A) the debtor does not
have an equity in such property; and (B) such property is not necessary to an effective
reorganization." 11 U.S.C. § 362(d)(2).[9]

51.    "The purpose of the automatic stay is to prevent a chaotic and uncontrolled
scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The
stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to
prevent conflicting judgments from different courts and in order to harmonize all of the creditors'
interests with one another." *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 133 (2d
Cir. 1992) (internal quotation marks omitted) (quoting *In re Fidelity Mortgage Investors*

---

[9] In the event that the Judgment Liens are senior to the Debtor's Third Lien Mortgage in priority against the Real
Property, relief under Section 362(d)(2) would also be appropriate because the Debtor would lack any equity in the
Real Property rendering it a wholly unsecured creditor of the Borrower Group, and unavailable to fund an effective
reorganization.

16

6428190.4

*(Fidelity Mortgage Investors v. Camelia Builders, Inc.)*, 550 F.2d 47, 55 (2d Cir. 1976), cert.

denied, 429 U.S. 1093, 97 S. Ct. 1107, 51 L. Ed. 2d 540 (1997)).

52.     On a motion for relief from the automatic stay under Section 362(d), "[t]he

burden is on the moving party to make an initial showing of 'cause' for relief from the stay." *In

re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999) (citing *Sonnax Industries, Inc. v. Tri Component

Prods. Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990)).

53.     However, "[n]either the statute nor the legislative history defines the term 'for

cause' and the legislative history gives only very general guidance." *Sonnax*, 907 F.2d at 1285.

As a result, the "facts of each request will determine whether relief is appropriate under the

circumstances." *Id.* at 1286 (citation and internal quotation marks omitted).  Although *Sonnax*

involved the continuation of an existing lawsuit, a number of its factors are relevant here.  Those

factors include:

> (1) whether relief would result in a partial or complete resolution of the
> issues;
>
> (2) lack of any connection with or interference with the bankruptcy case;
>
> (3) whether the other proceeding involves the debtor as a fiduciary;
>
> (4) whether a specialized tribunal with the necessary expertise has been
> established to hear the cause of action;
>
> (5) whether the debtor's insurer has assumed full responsibility for
> defending it;
>
> (6) whether the action primarily involves third parties;
>
> (7) whether litigation in another forum would prejudice the interests of
> other creditors;
>
> (8) whether the judgment claim arising from the other action is subject to
> equitable subordination;

6428190.4

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

*Mazzeo*, 167 F.3d at 143.

**Applicable Sonnax Factors Support a Finding of
"Cause" to Modify the Automatic Stay**

54.     Sterling submits that *Sonnax* actors (1), (2), (6), (7), (10), and (12) are applicable here.   First, a state court foreclosure action commenced by the first mortgagee, in this case, Sterling, would bring complete resolution on the foreclosure issue as involving all parties having an interest in the Real Property.   See N.Y.R.P.A.P.L. § 1311.   Although it would not resolve the Debtor's other claims against the Borrower Group in the Removed Foreclosure Action, those claims are akin to a surplus money proceeding where subordinate parties can adjudicate competing claims to the surplus money after foreclosure and payment of the first lien.   *See* N.Y. R.P.A.P.L. §§ 1361 *et seq.*   In effect, those parties are having that fight in this Court through the Removed Foreclosure Action.

55.     But for the Debtor holding a subordinate lien against the Real Property, Sterling's foreclosure action would have no connection to the Debtor's case.   It certainly does not interfere with what the Debtor is attempting to accomplish in this case.   In fact, it seeks the same relief as the Debtor is seeking vis-à-vis the Real Property, but in a cleaner manner because there is no challenge to Sterling's superior lien.   As a result, foreclosure by Sterling is not dependent on resolving the Debtor's litigation with the Borrower Group, and the Real Property can be sold, which is one of the Debtor's claims for relief sought in the Amended Complaint.   *See* Ex. H,

18

Amended Complaint ¶¶ 49-55. Accordingly, the second *Sonnax* factor weighs in favor of modifying the automatic stay in favor of Sterling. By extension, the Debtor is only one of several parties with subordinate liens against the Real Property. As a result, the sixth *Sonnax* factor also weighs in favor of modifying the stay.

56.    The Debtor commenced its foreclosure action against the Borrower Group because it was not being paid, resulting in its own inability to pay its own creditors. It seeks a sale of the Real Property through foreclosure to provide it with money to pay those creditors. Sterling's goals are not at odds and do not interfere with the Debtor's goal of collecting money to pay its creditors. It appears that there is equity in the Real Property beyond the First Lien and the Second Lien. Thus, assuming the Debtor prevails against the Borrower Group, money may be available to the Debtor from any such surplus monies. Sterling's successful foreclosure does not interfere with or prejudice the Debtor's creditors, thereby satisfying the seventh *Sonnax* factor.

57.    On the issues of judicial economy and the expeditious and economical resolution of litigation, regardless of the outcome of the Removed Foreclosure Action, further litigation would be required because that action does not address the two senior lienholders. If Sterling is permitted to move forward with a foreclosure action from the first lien position, only a single foreclosure action would be necessary, which promotes judicial economy.[10] Given that the Borrower Group is challenging the validity of the Debtor's mortgage and loans, that issue would need to be decided prior to this Court ruling on whether the Debtor's foreclosure request should be allowed. Thus, the foreclosure prong of the Removed Foreclosure Action is not yet ripe for determination, and Sterling should not be prejudiced by such fact.

---

[10] New York Real Property Actions and Proceedings Law § 1311 requires that in an action to foreclose on a real property mortgage, "[e]ach of the following persons, whose interest is claimed to be subject and subordinate to plaintiff's lien, shall be made a party defendant to the action: . . . (3) Every person having any lien or incumbrance upon the real property which is claimed to be subject and subordinate to the lien of the plaintiff." N.Y. R.P.A.P.L § 1311(3) (McKinney's 2017).

6428190.4

58.     Sterling submits that at least on the issue of whether to foreclose or not, it is in the best position to commence promptly a foreclosure action that encompasses all interests in the Real Property, not the partial interests currently found in the Removed Foreclosure Action. Thus, Sterling submits that judicial economy and economic resolution of litigation weighs in favor of granting a modification of the automatic stay.

59.     The impact of the stay on the parties and the balance of harms also weighs in favor of granting the motion.  152 Broadway is not paying Sterling on the First Lien Loan, and the only thing preventing it from commencing its own foreclosure action is the automatic stay that arose upon the Debtor's bankruptcy filing.    Thus, any continued delay of Sterling in enforcing its rights against 152 Broadway and the Real Property, which is not property of the Debtor's estate, is prejudicial to Sterling.  That delay is also prejudicial to the Debtor's estate and its creditors because the longer Sterling is prevented from asserting its rights against 152 Broadway and the Real Property, the more its claim will increase against 152 Broadway, which concomitantly decreases the amount of possible surplus money available after foreclosure.  On the other hand, the Debtor is not harmed at all.[11]  It has no defense to Sterling's foreclosure action, and it is already, in effect, prosecuting a surplus money proceeding as against the Borrower Group.  *See* Ex. H, Amended Complaint ¶ 31; Ex. I Minster Dec. ¶ 9.  Accordingly, the twelfth *Sonnax* factor weighs in favor of Sterling and granting the Motion.

60.     Based on the foregoing, the applicable *Sonnax* factors strongly support granting the motion, and permitting Sterling to commence a foreclosure action from its first lien position.

---

[11]  Significantly, 152 Broadway waived all defenses and counter claims in its loan agreements with Sterling.

6428190.4

**The Purpose of the Automatic Stay is Not
Implicated by Modifying the Stay as Against Sterling**

61.    Sterling also submits that "cause" is present here, because the purpose of the

Debtor's filing is not to stop a foreclosure action against it, but rather to speed up its own

foreclosure action against a mutual borrower.  In that context, Sterling's own foreclosure action

would not seek to collect from the Debtor.  Rather, it is required to name the Debtor as a

necessary party in a first lien foreclosure action inasmuch as the Debtor holds a subordinate lien

against common collateral, i.e., the Real Property.  *See* N.Y. R.P.A.P.L. § 1311(3).  The purpose

of the automatic stay is not met by continuing it as against Sterling under the facts of this case.

**Debtor's "Bad Faith Filing" is Grounds for Finding
"Cause" to Modify the Automatic Stay**

62.    "Cause" can also include a debtor filing its case in bad faith, with "bad faith" as a

basis to terminate the automatic stay evaluated under the same standards used by a court to find

bad faith as a basis to dismiss a case under 11 U.S.C. § 1112(b), i.e. the *C-TC 9th Ave.* factors.

*See, e.g.*, *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757, 760-61 (Bankr. S.D.N.Y. 1997).

Thus, courts in this District look to the *C-TC 9th Ave.* factors to consider whether "bad faith" is

present to find "cause" under § 362(d)(1).  *Id.* at 760; *see also* In re 68 West 127 Street, LLC.

285 B.R. 838, 843 (Bankr. S.D.N.Y. 2002).

63.    In this context, such factors exist to "assist the [Court's] exercise of discretion in

deciding when a debtor has improperly invoked the Bankruptcy Code, or is improperly hiding

behind the automatic stay to speculate with the creditor's collateral, because it is not able, or not

trying, to confirm a chapter 11 plan."  *68 W. 127 St.*, 285 B.R. 844 (Bankr. S.D.N.Y. 2002)

(citing *C-TC 9th Ave. P'ship*, 113 F.3d at 1311).  As discussed in addressing "bad faith" as a

ground to dismiss the Debtor's case (see discussion *supra*), Sterling has also established the C-

6428190.4

TC factors evidencing a bad faith filing sufficient to find "cause" to modify the automatic stay under § 362(d)(1) of the Bankruptcy Code.

64.    In the event the Court determines not to dismiss the Debtor's case as requested above, modifying the automatic stay to permit Sterling to commence a first lien foreclosure action would not prejudice the Debtor's ongoing litigation against the Borrower Group, and would not prejudice the Debtor itself because its rights to recover any surplus money are not impacted.

65.    Based on the foregoing, Sterling has established that the Debtor's filing was made in bad faith, sufficient to prove the existence of "cause" under Section 362(d)(1) of the Bankruptcy Code sufficient to modify the automatic stay as against Sterling to permit it to proceed with the enforcement of its rights.

## Compliance with Local Rule 9013-1(a)

66.    This Application does not raise any novel issues of law and the authorities relied upon are cited herein.  Accordingly, Movant respectfully submits that the requirements of Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York are satisfied.

6428190.4

**WHEREFORE**, it is respectfully requested that the Court enter an Order granting

Sterling relief from the Automatic Stay, or, in the alternative, dismissing the Debtor's case, and

for such other, further and different relief as the Court deems just, proper and equitable.

Dated: East Meadow, New York
      October 13, 2017

**CERTILMAN BALIN ADLER & HYMAN, LLP**
Attorneys for Secured Creditor and Party in Interest
Sterling National Bank, as successor in interest to
Provident Bank


By:    _/s/ Richard J. McCord_____
       Richard J. McCord, Esq.
       90 Merrick Avenue, 9th Floor
       East Meadow, New York 11554
       (516) 296-7000

23

6428190.4